UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————

№ 04-CV-5591 (JFB)

———————

SISLE I. HEYLIGER,

Plaintiff,

VERSUS

JO ANNE BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

Defendant.

———————

MEMORANDUM AND ORDER
September 21, 2006

———————

JOSEPH F. BIANCO, DISTRICT JUDGE:

*Pro Se* plaintiff Sisle I. Heyliger brings this action pursuant to 42 U.S.C. §§ 405(g) and 1631(c)(3), challenging the final decision of the defendant Commissioner of the Social Security Administration (the "Commissioner" and the "SSA," respectively) that Heyliger was not entitled to Disability Insurance Benefits or Supplemental Security Income payments based on disability as provided in Title II and Title XVI of the Social Security Act (the "Act"). The Commissioner moves for judgment on the pleadings pursuant to FED. R. CIV. P. 12(c), requesting that the Court affirm her findings. For the reasons set forth below, defendant's motion is denied, and the case is remanded to the Commissioner for further proceedings.

I. BACKGROUND AND PROCEDURAL HISTORY[1]

A. PRIOR PROCEEDINGS AND THE INSTANT ACTION

Heyliger filed an application for Supplemental Security Income payments ("SSI") on December 27, 2000, and an application for Disability Insurance Benefits ("DIB") on February 9, 2001, alleging that she became disabled on August 15, 2000, due to asthma, heart problems (congestive heart

---

[1] The background and procedural history are primarily drawn from the pleadings and the administrative record in this case.

failure), diabetes, and hypertension. (Record at 128-31, 134.)[2] The SSA denied both applications on August 16, 2001. (*Id*. at 93-97.) Heyliger then requested a hearing before an Administrative Law Judge (the "ALJ"). (*Id*. at 100.)

The ALJ, Marilyn P. Hoppenfeld, considered the matter *de novo* at a hearing on January 16, 2003. (*Id*. at 30-91.) Plaintiff appeared and testified, and was represented by Bonnie Katz, Esq. (*Id*.) Dr. Fred Siegel, a vocational expert, on the panel maintained by the Office of Hearings and Appeals, was also present and offered vocational opinion evidence. (*Id*. at 80-89.) On September 25, 2003, the ALJ found that Heyliger was not disabled within the meaning of the Act. (*Id*. at 27-28.) The ALJ's finding became the final decision of the Commissioner when the SSA Appeals Council denied Heyliger's request for review on October 21, 2004. (*Id*. at 4-8.)

Heyliger filed the instant action on December 17, 2004, claiming her disability began on August 15, 2000, as a result of "congestive heart failure, hypertension, diabetes, and sleep apnea," and seeking DIB and SSI benefits. (Compl. ¶¶ 5, 11.) The case was initially assigned to the Honorable Dora L. Irizarry. The Commissioner moved for judgment on the pleadings on August 11, 2005. On April 12, 2006, this case was reassigned to this Court. Oral argument was held on September 5, 2006.

After describing the plaintiff's background, the Court will review the medical history, followed by the ALJ's findings.

---

[2] References to "Record" are to the certified administrative record of proceedings related to this case.

B. PLAINTIFF'S AGE, EDUCATION, AND EXPERIENCE

Heyliger was born on May 23, 1959, in the British West Indies and is a naturalized United States citizen. (Record at 39, 128.) At the hearing held on January 16, 2003, she testified that she moved to the United States when she was one year of age, in 1960. (*Id.* at 39.) She lived in the United States Virgin Islands until 1974, when she moved to New York to attend high school. (*Id*.)

Heyliger graduated from high school in 1977 and obtained a Bachelor of Arts degree in February 1999. (*Id*. at 46.)[3] She testified that she recently completed child care certification courses at Queens College and took some courses in preparation for a Master's Degree in Early Childhood Education. (*Id*. at 43.) Heyliger testified that she attended a four-hour child abuse course on November 14, 2001, and a three-and-one-half-hour school violence prevention course on December 13, 2001. (*Id*. at 44.) Heyliger needs to take additional courses to become a certified teacher, but she testified that she cannot financially afford them. (*Id*.)

Heyliger worked for the Internal Revenue Service during summers while attending school, for the years 1976-1980. (*Id*. at 46.) In 1983, she worked for the Social Security Administration as a Benefits Authorizer. (*Id*. at 47.) Heyliger then moved to Texas, where she worked for Federated Department Stores

---

[3] In her September 25, 2003 decision, the ALJ stated that Heyliger graduated from high school in 1971, then went on to obtain a B.A. degree in Florida, and "obtained *another* B.A. degree in 1999, from Queens College." (Record at 19.) At the hearing on January 16, 2003, Heyliger stated that she completed high school in 1977, commenced college in Florida thereafter, and obtained her bachelor of arts degree in February 1999 after completing two required courses at Queens College. (*Id*. at 46.)

2

as a loss prevention investigator from 1984 until February 1987. (*Id*. at 47-49.) In this position, she reviewed paper invoices and stock shipments and used a computer. (*Id*.) In 1987, she began working for the United States Post Office as a mail handler, but took time off after her son was born on April 21, 1988. (*Id*. at 48-49.) Heyliger then moved from Texas back to New York, and resumed working for the United States Post Office. (*Id*. at 49.) Her mail handler position involved standing and lifting at least seventy pounds. (*Id*. at 50.) After leaving the post office in October 1989, Heyliger began working for the ABC Television Network in December 1989. (*Id*. at 51.) She started working in the mail room and eventually became a news researcher in the audience information department. (*Id*.) Heyliger left ABC in 1997, and accepted a $30,000 buy-out. (*Id*.) In 1998, Heyliger took courses at Queens College. (*Id*. at 52.) In 1999 and 2000, Heyliger worked intermittently for the United States Census Bureau and at P.S. 143 in Queens as a substitute teacher. (*Id*. at 52, 64-65.) She worked for the Census Bureau until April 2000, and at P.S. 143 until June 2000. (*Id*. at 64-65.) Heyliger stated that she has not worked since June 2000, and that the alleged onset date of her disability was August 15, 2000. (*Id*. at 63-65.)

C. NON-MEDICAL EVIDENCE

1. PLAINTIFF'S TESTIMONY

At the January 16, 2003 administrative hearing, Heyliger testified that she developed a deep, persistent cough in August 2000. (*Id.* at 63-64.) She stated that she was unable to work due to difficulty breathing and walking. (*Id*. at 69-70.) She testified that getting up to go to the bathroom, answer the telephone or walk out of her first floor apartment caused her to become out of breath. (*Id*.) Heyliger stated that, during this time, she had been seeing Dr. Chendra Reddy for routine treatment at a clinic associated with Elmhurst Hospital. (*Id*. at 58.) She testified that Dr. Reddy had monitored her blood sugar levels, and prescribed cough medicine. (*Id*. at 58-59.) Heyliger stated that one day, in November 2000, she "fell out on a bus and ended up at the hospital." (*Id*. at 59.) She testified that she spent four or five days in Elmhurst Hospital as a result of this incident. (*Id*. at 53-54.) Heyliger subsequently underwent a cardiac catheterization on an outpatient basis. (*Id*. at 54-55.)

Heyliger testified that she had improved and started to feel a lot better during the summer of 2002. (*Id*. at 71.) She stated that, prior to this time, she was disabled to the point where she could not help herself. (*Id*. at 69.) However, at the hearing, Heyliger stated that she could be at a point where she could perform some kind of work. (*Id*.) Heyliger testified that, since the summer of 2002, she could walk 8-10 blocks. (*Id*. at 66.) She stated that before that time she would walk down four or five steps, become out of breath, and have to stop and sit to catch her breath. (*Id*. at 70.) Heyliger testified that she did not "do very well standing," but on the day of the hearing, she had stood for five or ten minutes waiting for the bus. (*Id*. at 67-68.) She further testified that she could sit, as long as she could move around, and also stated that she could bend, and kneel, with difficulty getting up. (*Id*.) Heyliger also stated that she could lift ten pounds. (*Id*. at 68.) Finally, when asked what would stop her from performing a receptionist-type job, Heyliger responded, "Nothing." (*Id*. at 69.)

Heyliger stated that her daily routine was to wake up at 5:30 a.m. (*Id*. at 71.) She testified that during the time she was allegedly disabled, she would sleep a lot and was

3

always tired. (*Id.*) Heyliger's mother, brother, son, and cousin helped her with household chores. (*Id.* at 71-72.) During this time, Heyliger spent her time reading, working on the computer, and doing household chores with the assistance of her family. (*Id.* at 147.) During the period of June 2000 to June 2002, Heyliger did not take any trips or vacations. (*Id.* at 72.) She denied any emotional problems and also denied smoking, drinking, or using illegal drugs. (*Id.* at 73-74.)

Heyliger testified that she was aware she had been previously diagnosed with congestive heart failure and cardiac enlargement. (*Id.* at 74.) She also stated that her doctor advised her that she had impaired ventricular functioning. (*Id.* at 75.) She stated that she took medications for these illnesses. (*Id.*) Heyliger also testified that she took medication for hypertension and for her blood sugar, which was under control at the time of the hearing. (*Id.* at 77-78.) She also stated that she did not have asthma, but was allergic to orange blossoms. (*Id.* at 78-79.)

2. VOCATIONAL EXPERT'S TESTIMONY

Dr. Fred Seigel, a vocational expert, also testified at the January 16, 2003 hearing. (*Id.* at 80-89.) Dr. Seigel testified that Heyliger had past work experience as a teacher of elementary school, which he described as a highly skilled job requiring a light exertional capacity. (*Id.* at 81.) She also had past relevant work as a researcher, a skilled job, requiring a sedentary exertional capacity. (*Id.* at 82.) Dr. Seigel classified Heyliger's job in the post office as a mail handler, barely semi-skilled, requiring heavy exertional capacity. (*Id.*) He further stated that Heyliger worked as a combination receptionist and mail clerk; the receptionist job is semi-skilled, requiring sedentary exertional capacity, and the mail clerk job is unskilled, requiring light exertional capacity. (*Id.*)

At the hearing, the ALJ also asked Dr. Seigel a series of hypothetical questions regarding an individual with the same vocational background as Heyliger. (*Id.* at 83-89.) In response to the first hypothetical question, which assumed Heyliger's age, education, past work history, and residual functional capacity for sedentary work, in an environmentally controlled atmosphere, Dr. Seigel stated that Heyliger could perform her past work as a researcher and/or receptionist. (*Id.* at 83-84.) In response to a second hypothetical, involving an individual who could lift and carry five pounds, could stand and walk for less than two hours, and could sit for up to six hours per day, Dr. Seigel stated that such a person could perform Heyliger's past work as a receptionist or researcher. (*Id.* at 84.) In a third hypothetical question, Dr. Seigel testified that, if it is found Heyliger could not sit for six hours and was limited to four hours, she could not perform sedentary work. (*Id.* at 85-86.) When asked whether the fact that Heyliger was overweight would interfere with her job as a receptionist, Dr. Seigel opined that it would not.[4] (*Id.* at 87.)

---

[4] At the hearing on January 16, 2003, Heyliger testified she weighed 287 pounds and was 5 feet, 5 inches tall. (Record at 40.)

D. MEDICAL EVIDENCE

1. EVIDENCE DURING THE RELEVANT PERIOD[5]

A. PLAINTIFF'S TREATMENT

I. ELMHURST HOSPITALIZATION: NOVEMBER 13-17, 2000

Heyliger was hospitalized at Elmhurst Hospital from November 13 to November 17, 2000. (*Id.* at 208-09.) She was admitted due to chronic cough, shortness of breath and tachycardia. (*Id.*) Hospital admission forms noted a history of diabetes, hypertension and obesity (with a weight of 312 pounds at the time of hospitalization). (*Id.* at 208-14.)

On November 13, 2000, a chest X-Ray showed moderate cardiomegaly with left ventricular prominence. (*Id.* at 179.) Heyliger's lungs were clear and the rib cage, hemidiaphragms and other findings were within normal limits. (*Id.*)

On November 16, 2000, an echocardiogram was performed. (*Id.* at 216-17.) It revealed dilation of the four heart chambers and diffuse hypokinesis of the left ventricle. (*Id.*) Overall left ventricular contractility was severely reduced. (*Id.*) The mitral and tricuspid valves were normal. (*Id.*) The aortic and pulmonic valves were not well-visualized. (*Id.*) Doppler findings were consistent with moderate to severe mitral regurgitation and mild aortic regurgitation. (*Id.*) Pulmonary function studies were consistent with moderate to severe restrictive defect and severely reduced diffusing capacity. (*Id.* at 320-21, 443.)

---

[5] The relevant period is from August 15, 2000, Plaintiff's alleged onset date, to September 25, 2003, the date of the ALJ Decision.

On November 17, 2000, a CT Scan of the chest revealed cardiomegaly. (*Id.* at 180.) Thickening of the left interlobar fissure was seen in lower part with small calcification. (*Id.*) Minimal streakiness was seen in the periphery of the left lower lobe. (*Id.*) There was no pleural effusion. (*Id.*) No mediastinal or hilar lymphadenopathy was grossly seen and degenerative spine disease was noted. (*Id.*)

At discharge, the diagnosis was asthma versus congestive heart failure versus restrictive lung disease. (*Id.* at 387.) Heyliger's heart had a regular rate and rhythm and her lungs had mild, diffuse wheezes. (*Id.*) A Nursing Discharge Summary noted that Heyliger was independent in ambulation, bathing, dressing, grooming, feeding, shopping, cooking, and stair climbing. (*Id.* at 384.) Medications on discharge were Lasix, Lisinopril, Prednisome, Albuterol, and Ferrous Sulfate. (*Id.* at 388.) Heyliger's "condition on discharge in comparison to admission" was noted as "improved." (*Id.*) Heyliger was advised to follow up with Dr. Reddy and the pulmonology clinic, and partake in a sleep study. (*Id.*)

II. DR. CHENDRA REDDY: NOVEMBER 21 AND NOVEMBER 22, 2000 EXAMINATIONS; MARCH 8, 2001 REPORT

On November 21, 2000, Heyliger saw her primary care physician, Dr. Reddy, for a follow-up appointment. (*Id.* at 252.) At this time, Dr. Reddy diagnosed secondary cardiomyopathy, unspecified. (*Id.*)

The following day, Heyliger was in mild respiratory distress and again saw Dr. Reddy. (*Id.* at 250-51.) At this time, Dr. Reddy reported severely reduced cardiac function and global hypokinesis. (*Id.* at 250.) In addition, a cardiac examination revealed mild

5

tachycardia. (*Id* at 251.) Heyliger's lungs were clear to auscultation, and there was no pedal edema. (*Id*.) During the appointment, Dr. Reddy discussed the prognosis, therapy, and need for proper follow up. (*Id.* at 250.) Medications and weight loss goals were also discussed. (*Id.*)

On March 8, 2001, Dr. Reddy completed a report regarding Heyliger's condition. (*Id*. at 188-93.) In the report, Dr. Reddy noted that she had been treating Heyliger every two months since September 4, 1999. (*Id*.) At this time, Heyliger measured five feet, six inches tall and weighed 303 pounds. (*Id*.) Recent blood pressure readings were 140/90 and 140/80. (*Id*.)

Dr. Reddy reported that Heyliger's symptoms were dyspnea on exertion and orthopenea. (*Id*.) Dr. Reddy also noted that Heyliger had experienced moderate improvement in symptoms with her medications. (*Id*.) At this time, clinical findings were obesity, shortness of breath, pallor, and expiratory wheezes. (*Id.*) Dr. Reddy reported that Heyliger's heart had a normal rate and rhythm and indicated that the classification of Heyliger's heart disease had been reduced from four to three-to-four.[6] (*Id*.) Pulmonary function tests were consistent with moderate to severe restrictive airway disease, a decreased diffusing capacity, and a moderate obstructive component. (*Id*.)

In evaluating Heyliger's physical abilities, Dr. Reddy indicated that Heyliger had a severely restricted exercise tolerance to less than one block. (*Id*.) Dr. Reddy reported that Heyliger could lift/carry five pounds occasionally, stand/walk less than two hours per day, sit up to six hours per day, and that she was limited in pushing/pulling. (*Id*.)

III. ELMHURST HOSPITAL VISITS: DECEMBER 21, 2000; JANUARY 4, 2001; JANUARY 29, 2001; FEBRUARY 21, 2001; FEBRUARY 23-26, 2001; JULY 9, 2001; JULY 24, 2001; OCTOBER 12, 2001; AND FEBRUARY 15, 2002

On December 21, 2000, Heyliger was seen at the cardiac ambulatory clinic at Elmhurst Hospital Center for evaluation of shortness of breath. (*Id*. at 446.) At this time, Heyliger weighed 314 pounds and her blood pressure was 140/90. (*Id*.) Her lungs revealed bilateral crackles and there was no pedal edema. (*Id.*) An ECG revealed ventricular bigeminy, right atrial enlargement and nonspecific anterolateral T-wave abnormalities. (*Id*. at 447.)

On January 4, 2001, Heyliger underwent a transesophageal echocardiograph. (*Id*. at 182.) Findings noted moderate to severe mitral regurgitation, moderate tricuspid and pulmonic regurgitation, and mild aortic regurgitation. (*Id.*) The left atrium was dilated and left ventricle function was moderately to severely reduced, with an ejection fraction of approximately 35%. (*Id*.) There was no intracardiac shunt and the thoracic aorta was normal. (*Id*.)

On January 29, 2001, Heyliger returned to the cardiac clinic and complained of shortness of breath on exertion. (*Id*. at 435.) Upon examination, Heyliger weighed 312 pounds

---

[6] The American Heart Association classifies cardiac disease based on clinical severity and prognosis. Individuals with class four cardiac disease are unable to carry on any physical activity without discomfort. Symptoms of heart failure or the anginal syndrome may be present even at rest. If any physical activity is undertaken, discomfort increases. Individuals with class three cardiac disease have marked limitation of physical activity. They are comfortable at rest. Less than ordinary activity causes fatigue, palpitation, dyspnea or anginal pain. *See* http://www.americanheart.org/presenter.jhtml?identifier=4569.

6

and her blood pressure was 120/80. (*Id*.) A heart examination revealed mitral and tricuspid regurgitation. (*Id*.) There was no edema of the extremities and Heyliger was scheduled for cardiac catheterization. (*Id*.)

On February 21, 2001, an EKG was performed. (*Id*. at 433.) The test revealed sinus tachycardia, multiple premature complexes, possible left atrial enlargement and diffuse, non-specific T-wave abnormalities. (*Id*.)

On February 23, 2001, Heyliger was admitted to Elmhurst Hospital for a catheterization procedure. (*Id*. at 270.) On February 26, 2001, she was discharged from the hospital. (*Id.* at 298.) Before the procedure, her blood pressure was 137/76. (*Id*. at 276.) She was calm and was not experiencing any chest pain. (*Id*.) During the procedure, Heyliger was stable and there were no complications. (*Id*. at 277.)

The Cardiac Catheterization Report found that Heyliger had a normal right coronary artery, large size, tortuous; normal left main coronary artery; normal left anterior descending coronary artery, large size; normal left circumflex coronary artery, large size. (*Id*. at 279.) The Report concluded that there were normal arteries of the right dominant system and normal coronary arteries. (*Id*. at 280.) Left ventriculography was moderately reduced and valves had 2+ mitral regurgitation. (*Id*.)

On July 9, 2001, Heyliger returned to the ambulatory care clinic at Elmhurst Hospital. (*Id*. at 430.) At this time, Heyliger indicated she felt much better and had no shortness of breath. (*Id*.) Heyliger's blood pressure was 160/90 and her lungs were clear. (*Id*.) An examination of the heart revealed a presystolic murmur and there was no edema of the extremities. (*Id*.) An EKG revealed normal sinus rhythm and multiple ventricular premature complexes. (*Id*. at 429.) Heyliger's Carvedilol (Coreg) dosage was increased. (*Id*. at 430.)

On July 24, 2001, a multigated angiogram ("MUGA") was performed. (*Id*. at 451.) The test revealed low normal function of slightly dilated ventricles and an ejection fraction of 56%. (*Id*.)

On October 12, 2001, Heyliger returned to the cardiac clinic. (*Id*. at 421.) At this time, she indicated that she was feeling much better, and reported that she was able to walk two miles. (*Id*.) Heyliger did not have shortness of breath and her lungs were clear to auscultation. (*Id*.) Heyliger's Lasix and Digoxin were reduced. (*Id*.)

On February 15, 2002, Heyliger again visited the cardiac clinic. (*Id*. at 414.) At this time, Heyliger did not have shortness of breath or chest pain. (*Id*.) Heyliger's blood pressure was 149/90, her lungs were clear, heart sounds were normal, and there was no edema. (*Id*.) An EKG revealed multiple ventricular premature complexes and possible left atrial enlargement. (*Id*. at 413.) Heyliger's Carvedilol dosage was increased, and she was advised to return in two months. (*Id*. at 414.)

### IV. DR. MEHRAN ATTARI, CARDIAC RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT: MAY 6, 2002

On May 6, 2002, Dr. Mehran Attari completed a Cardiac Residual Functional Capacity Assessment and diagnosed cardiomyopathy, heart failure, and diabetes mellitus. (*Id*. at 236-40.) On the assessment form, Dr. Attari noted that this appointment was his first with Heyliger, although she was

7

not a new clinic patient. (*Id.* at 236.)

Dr. Attari reported Heyliger's symptoms were shortness of breath, fatigue, weakness, and edema. (*Id.* at 237.) Dr. Attari noted that cardiac catheterization revealed normal arteries, ejection fraction was 40% (moderately reduced), and there was moderate mitral regurgitation. (*Id.* at 236.) In addition, Dr. Attari reported that Heyliger had a three-to-four block exercise tolerance and that stress could exacerbate her symptoms. (*Id.* at 237.) Dr. Attari noted that Heyliger should avoid all but low stress situations and stated that her functional limitations caused emotional difficulties such as depression or anxiety. (*Id.* at 238.) He also noted that Heyliger's symptoms were possibly sufficiently severe to interfere with attention and concentration. (*Id.*)

Dr. Attari reported that Heyliger's impairments lasted or can be expected to last at least twelve months. (*Id.* at 239.) He indicated that, in an eight-hour workday, Heyliger could stand/walk less than two hours and sit for about four hours. (*Id.*) Dr. Attari indicated that Heyliger did not need a job which permits shifting positions at will from sitting, standing, or walking. (*Id.* at 240.) However, he did note that Heyliger would need to take an uncertain number of unscheduled breaks of at least thirty minutes' duration. (*Id.*) Overall, Dr. Attari reported that his prognosis was guarded. (*Id.* at 239.)

B. CONSULTING PHYSICIANS

I. DR. MIE LIN: EXAMINATION ON DECEMBER 28, 2000

On December 28, 2000, Dr. Mie Lin, an independent internist, examined Heyliger. (*Id.* at 172-74.) In the report, Dr. Lin noted that Heyliger traveled to the examination alone by bus and subway. (*Id.* at 172.) At the examination, Heyliger complained of shortness of breath on exertion and stated that she could walk a maximum of only one block without rest. (*Id.*) Dr. Lin noted that Heyliger "spends most of her time going to the library and doing some computer work." (*Id.* at 173.) Dr. Lin also reported that Heyliger sleeps when she is not feeling well and can do household chores with the help of her son. (*Id.*)

Upon examination, Heyliger was five feet and three-and-one-half inches tall, and weighed 310 pounds. (*Id.*) Her blood pressure was 140/80. (*Id.*) Heyliger was able to ambulate without assistance, and she had a normal station and gait. (*Id.*) In addition, Dr. Lin noted that Heyliger was able to get on and off the examining table without difficulty. (*Id.*) Examination of the chest and lungs revealed they were clear to auscultation and percussion; no wheezes, rales, or rhonchi. (*Id.*) An EKG showed sinus tachycardia at 115 beats per minute and left atrial enlargement. (*Id.*)

Dr. Lin noted that Heyliger had no carotid bruits, no masses. (*Id.*) In addition, a cardiac examination found regular rate and rhythm, normal S1 and S2, no murmurs, rubs, gallops or clicks. (*Id.*) There was no clubbing, cyanosis or edema of the extremities, and peripheral pulsations were intact and symmetrical throughout. (*Id.*) All joints had full ranges of motion, without deformity, swelling or tenderness. (*Id.*) The spine had a normal range of motion; no spasm, deformity, or tenderness. (*Id.*) A neurological examination was also normal. (*Id.*)

Dr. Lin diagnosed stable diabetes, unstable congestive heart failure, stable history of hypertension, morbid obesity, and an abnormal EKG. (*Id.*) In the report, Dr. Lin

8

noted that Heyliger was able to sit, stand, handle objects, hear and speak, and that she had mild functional impairment in walking, lifting, carrying heavy objects and traveling because of her congestive heart failure. (*Id*.) Dr. Lin further opined that Heyliger was able to perform sedentary activity. (*Id*.) However, Dr. Lin also reported that Heyliger was "a candidate for SSI because of her high blood pressure with congestive heart failure and severely decreased function of her heart on echocardiogram," and wrote that the prognosis was guarded. (*Id*.)

### II. DR. SOO PARK: EXAMINATION ON MARCH 16, 2001

On March 16, 2001, Dr. Soo Park, an independent internist, examined Heyliger. (*Id.* at 195-97.) At this time, Heyliger gave a history of diabetes, congestive heart failure, and high blood pressure. (*Id.* at 195.) Heyliger also reported shortness of breath with minimal activities. (*Id.*) Dr. Park noted that Heyliger did not have a history of a stroke, heart attack, or kidney failure. (*Id*.) Heyliger informed Dr. Park that she spent her day watching television, reading, and going to the library. (*Id.*)

Upon physical examination, Heyliger measured sixty five and one-half inches tall and weighed 320 pounds. (*Id*.) Her blood pressure was 130/90. (*Id*.) Dr. Park noted that Heyliger "appear[ed] stated age and [was] in no acute distress." (*Id.*) The doctor also noted that Heyliger was able to undress, dress, and get on and off the examination table without difficulty. (*Id.*) Dr. Park also reported that Heyliger had shortness of breath with minimal activities. (*Id.*)

Dr. Park found no cyanosis or jaundice. (*Id*.) Heyliger walked normally and her station and sitting positions were normal. (*Id*.) Heyliger's spine had a normal lumbar lordosis with no scoliosis. (*Id*. at 196.) Straight leg raising was to sixty degrees bilaterally. (*Id.*) In addition, all joints had full range of motion without deformity, swelling, redness, or tenderness. (*Id*.)

Dr. Park found that Heyliger's lungs were clear, and found no deformity, dullness, wheezing, ronchi, rales or adventitia sounds. (*Id*.) Her heart rate was regular; S1 was diminished and there was S4; and a Grade I/VI systolic murmur was noted. (*Id*.) The Pulmonary Function test showed that forced vital capacity was mildly reduced, FEV1 was mildly reduced, and the FEV1/FVC ratio was normal. (*Id*.) Overall, the Pulmonary Function Test showed a mild degree of restrictive changes and improvement after bronchodilators. (*Id.*) Furthermore, an EKG showed no evidence of acute ischemia or left ventricular hypertrophy, but showed frequent PVCs. (*Id*. at 196-97.)

Dr. Park's final impression was a history of non-insulin dependent diabetes, a history of congestive heart failure (with shortness of breath with less than ordinary activities), a history of high blood pressure with no other complications, and a history of obesity. (*Id.* at 197.) Dr. Park found that Heyliger was moderately limited in her ability to lift, bend, walk, stand, or push and pull on arm controls. (*Id*.)

### III. DR. URI BIRNBAUM: EXAMINATION ON MAY 18, 2001

On May 18, 2001, Dr. Uri Birnbaum, an independent internist, examined Heyliger. (*Id.* at 220-21.) Heyliger presented a history of congestive heart failure, diabetes, and elevated blood pressure. (*Id*. at 220.)

Upon examination, Heyliger measured

five feet, five inches tall and weighed 303 pounds. (*Id*.) Her blood pressure was 130/90. (*Id*.)

Dr. Birnbaum reported that Heyliger's heart had a regular rhythm and her lungs were clear. (*Id*.) An Electrocardiogram showed nonspecific T-wave changes and a chest x-ray showed an enlarged heart. (*Id*. at 221.) An Echocardiogram was also performed and demonstrated an ejection fraction of 49%, enlarged left ventricle, impaired systolic function, diffuse hypokinesia, and enlarged left atrium and right ventricle. (*Id*.)

Dr. Birnbaum reported there was no heart congestion, but noted that this may have been due to the adequate medication Heyliger was taking. (*Id*.) He noted that the Electrocardiogram and Echocardiogram showed definite myocardial disease, probably secondary to diabetic cardiomyopathy. (*Id*.) Dr. Birnbaum reported that Heyliger's gross overweight condition indicated a very poor prognosis for the future. (*Id*.)

Finally, Dr. Birnbaum reported that there was sufficient evidence to indicate that Heyliger was unable to perform any physical work that involved prolonged walking, standing, lifting, or pushing. (*Id*.)

### IV. DR. E. VIRGO: OPINION ON JUNE 14, 2001

On June 14, 2001, Dr. E. Virgo, a non-examining state agency medical consultant, completed a Request for Medical Advice. (*Id*. at 227.) In the report, Dr. Virgo opined that Heyliger should be able to perform sedentary work. (*Id*. at 226.)

### 2. EVIDENCE SUBMITTED TO THE APPEALS COUNCIL

On July 3, 2003, an echocardiogram indicated that Heyliger had normal chamber sizes and normal left ventricular function. (*Id*. at 463.) The test also revealed that Heyliger had concentric left ventricular hypertrophy, and trace mitral and tricuspid regurgitation. (*Id*. at 463-64.) Ejection fraction was measured at 64%. (*Id*. at 464.)

On July 16, 2003, an EKG revealed nonspecific ST abnormalities and occasional ventricular premature beats. (*Id*. at 462.) Heyliger's blood pressure was 130/70, pulse rate was regular, and there was no arrhythmia or congestive failure. (*Id*. at 461.) Physical examination revealed an S4 gallop, the lungs were clear, extremities had no edema, and peripheral pulses were normal. (*Id.*) At this time, Dr. Bijoy Mehta reported that Heyliger had no shortness of breath and stated that her echocardiogram demonstrated marked improvement compared to her previous echocardiogram. (*Id.*) Dr. Mehta advised Heyliger to continue current medications and return in three months. (*Id.*)

On November 26, 2003, Heyliger returned to Dr. Mehta. (*Id*. at 460.) At this time, Dr. Mehta reported that Heyliger's echocardiogram demonstrated remarkable improvement. (*Id*.) Blood pressure was 132/78, ejection faction was 64%, and there was no arrhythmia or congestive failure. (*Id.*) Dr. Mehta further indicated that Heyliger could ambulate as much as she liked. (*Id.*)

On March 2, 2004, an echocardiographic report indicated normal chamber sizes and wall motion. (*Id.* at 468.) Normal systolic left ventricular function and contractility were noted. (*Id.*) There was also possible left ventricular diastolic dysfunction. (*Id.*)

Ejection fraction was 61.5%. (*Id.*)

On March 11, 2004, Dr. Mehta reported that Heyliger had dyspnea on moderate effort, but that it was due to lack of conditioning and obesity. (*Id.* at 465.) Dr. Mehta also indicated there was no palpitation, dizziness, nor fainting. (*Id.*) Heyliger's blood pressure was 166/90 and her pulse rate was normal. (*Id.*) There was no arrhythmia or congestive failure and the lungs were clear. (*Id.*) At this time, Heyliger also took a treadmill stress test. (*Id.*) The test did not reveal angina, ischemia or arrhythmia. (*Id.*) Finally, Dr. Mehta reported that Heyliger's history of congestive heart failure was "currently compensated." (*Id.*)

On March 17, 2004, Dr. Reddy reported that Heyliger's last blood pressure reading was 128/85. (*Id.* at 470.) Dr. Reddy also indicated that Heyliger's respiratory and cardiac systems were within normal limits and that she had a good exercise tolerance. (*Id.*)

On September 9, 2004, Dr. Reddy reported that Heyliger had successfully undergone gastric reduction surgery and that her weight had fallen to 254 pounds. (*Id.* at 469.) At this time, Heyliger's blood pressure was 136/86. (*Id.*) Dr. Reddy again noted that Heyliger had a good exercise tolerance. (*Id.*)

### E. THE ALJ'S DECISION

In a written decision dated September 25, 2003, the ALJ denied Heyliger's disability claim. (*Id.* at 16-28.) At the outset of her decision, the ALJ determined that Heyliger met the nondisability requirements for a Period of Disability and Disability Insurance Benefits set forth in the Act. (*Id.* at 17.) In determining the validity of Heyliger's claim, the ALJ then proceeded through the sequential evaluation outlined in *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999).[7]

#### 1. PRESENT EMPLOYMENT

The ALJ first determined that Heyliger was not then employed, and had not engaged in substantial gainful activity since the alleged onset date of August 15, 2000. (Record at 18.)

#### 2. EXISTENCE OF SEVERE IMPAIRMENT

Next, the ALJ concluded that the medical evidence indicated that Heyliger had mild aortic regurgitation, a history of asthma, and a history of hypertension and diabetes mellitus. (*Id.*) The ALJ determined that these impairments could be severe, in that they could cause vocational limitations, within the meaning of the Regulations. (*Id.*)

#### 3. THE LISTINGS

The ALJ then determined that, although Heyliger's impairments could be severe, they were not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (*Id.*) The ALJ noted that, in making this determination, particular attention was given to listings 4.00 (Cardiovascular Disorders) and 9.00 (Endocrine Disorders). (*Id.*)

#### 4. DETERMINATION OF RESIDUAL FUNCTIONAL CAPACITY TO PERFORM PAST RELEVANT WORK

Even though Heyliger's impairments did not equal the severity of the impairments listed by the Commissioner, because the ALJ made a finding of severe impairment, she was still required to determine whether Heyliger

---

[7] The sequential evaluation outlined in *Brown* is discussed below.

retained the residual functional capacity to perform her past relevant work. 20 C.F.R. §§ 404.1520, 416.920. Residual functional capacity is "the most [an individual] can still do despite [physical and mental] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945. If an individual can perform her past relevant work, she will not be found disabled. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

In making this assessment, ALJ Hoppenfeld noted that:

> The claimant's testimony and all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 CFR §§ 404.1529 and 416.929, and Social Security Ruling 96-7p., must be considered. All medical opinions, which are statements from acceptable medical sources, which reflect judgments about the nature and severity of the impairments and resulting limitations (20 CFR §§ 404.1527 and 416.927 and Social Security Rulings 96-2p and 96-6p), also must be analyzed.

(Record at 18.)

The ALJ then proceeded to determine Heyliger's residual functional capacity, taking into consideration both the medical evidence in the record and Heyliger's testimony. (*Id.* at 18-28.)

In reviewing the medical evidence, the ALJ considered reports from Elmhurst Hospital, Dr. Reddy, Dr. Lin, Dr. Park, Dr. Birnbaum, Dr. Virgo, and Dr. Attari. (*Id.* at 21-24.) In this review, the ALJ evaluated objective medical facts, observations, clinical findings, and diagnoses. (*Id.*) In her decision, the ALJ found that, although Heyliger experienced a severe cardiac/respiratory incident in November 2000 which necessitated hospitalization, the record demonstrated that she had been responsive to treatment and her medical condition improved. (*Id.* at 25.)

The ALJ found that, although Heyliger testified that between June 2000 and June 2002 she could not work because she had great difficulty breathing and walking, the medical record did not support these allegations. (*Id.*) To support this conclusion, the ALJ first pointed to the fact that the medical documentation found full range of motion of all joints. (*Id.*) The ALJ also stated that no treating source suggested the need for any MRI of the back. (*Id.*) Furthermore, the ALJ concluded that "[t]he record is devoid of any objective findings that would limit [Heyliger] from sitting for six hours in an eight hour day." (*Id.*)

With respect to Heyliger's cardiac condition, the ALJ concluded that "the objective medical evidence established that [Heyliger] had moderate to severe mitral regurgitation." (*Id.*) However, the ALJ also indicated that the cardiac catheterization, performed in February 2001, "did not find that the condition reported in the Echocardiography was to that level." (*Id.*) Finally, the ALJ pointed to Dr. Reddy's report that "the coronaries were clean with no evidence of disease." (*Id.* at 450.) The ALJ also concluded that Heyliger's pulmonary condition improved. (*Id.* at 25.) Here, the ALJ stated "[i]t appears the shortness of breath, which precipitated her admission to the hospital, was due to coughing" and noted that the coughing resolved after discharge. (*Id.*)

In making her determination of residual functional capacity, the ALJ also considered Heyliger's testimony and subjective complaints. (*Id.* at 19-20, 26.) However, the ALJ did not accept Heyliger's allegations regarding her limitations prior to June 2002 to the extent alleged because the ALJ found they were not supported by substantial medical evidence. (*Id.* at 27.) In making this determination, the ALJ considered, in detail, Heyliger's activities during the alleged period of disability. (*Id.* at 26.) Here, the ALJ noted that Heyliger "maintained a household, cared for her 12 year old child; was attending classes at Queens College until December, 2002 and obtained a Substitute Teacher's Certificate and School Violence Prevention Certificate, which required classes that were about 3 ½ to 4 hours." (*Id.*) The ALJ also considered a March 1, 2001 report, where Heyliger stated that she reads, works on her computer, goes for walks, grocery shops, and cooks basic meals every few days. (*Id.*) After considering these activities, the ALJ concluded that "[Heyliger's] testimony was not accepted to the extent alleged." (*Id.*)

After reviewing the medical evidence and Heyliger's allegations, the ALJ concluded that Heyliger retained the residual functional capacity for a full range of sedentary work.[8] (*Id.* at 26.) Specifically, the ALJ determined that Heyliger was capable of "sitting for six hours in an eight hour day; standing and walking for two hours and lifting ten pounds occasionally." (*Id.* at 27.) In making this determination, the ALJ noted that "[c]onsideration was given to the opinion of the treating source, but it was not supported by any objective clinical findings," and did not provide any further explanation. (*Id.*)

Finally, the ALJ considered the testimony of the Dr. Seigel, the Vocational Expert, to determine whether Heyliger could perform her past relevant work. (*Id.* at 26, 80-89.) First, the ALJ noted Dr. Seigel's conclusion that Heyliger had past relevant work as a substitute teacher, researcher, receptionist, and post office mail handler. (*Id.* at 26, 81-82.) Next, the ALJ pointed to Dr. Seigel's testimony that, based on Heyliger's residual functional capacity for sedentary work, Heyliger could return to her past relevant work as a researcher or receptionist. (*Id.* at 26, 83-84.) Finally, in her decision, the ALJ adopted Dr. Seigel's testimony and concluded that Heyliger retained the residual functional capacity to perform her past relevant work as a researcher or receptionist. (*Id.* at 27.)

II. DISCUSSION

A. APPLICABLE LAW

1. STANDARD OF REVIEW

A district court may only set aside a determination by an ALJ which is based upon legal error or not supported by substantial evidence. *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citing *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)). The Supreme Court has defined "substantial evidence" in Social Security cases as "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Quiones v. Chater*, 117 F.3d 29, 33 (2d Cir.

---

[8] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 416.967(a).

13

1997) (defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion") (internal quotations and citations omitted). Furthermore, "it is up to the agency, not th[e] court, to weigh the conflicting evidence in the record." *Clark v. Commissioner of Social Security*, 143 F.3d 115, 118 (2d Cir. 1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, even if there is substantial evidence for the plaintiff's position. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991). "Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner." *Yancey*, 145 F.3d at 111; *see also Jones*, 949 F.2d at 59 (quoting *Valente v. Sec'y of Health and Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)).

2. THE DISABILITY DETERMINATION

A claimant is entitled to disability benefits under the Act if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the Act unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has promulgated regulations establishing a five-step procedure for evaluating disability claims. *See* 20 C.F.R §§ 404.1520, 416.920. The Second Circuit has summarized this procedure as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown*, 174 F.3d at 62 (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). The claimant bears the burden of proof with regard to the first four steps; the Commissioner bears the burden of proving the last step. *Brown*, 174 F.3d at 62.

The Commissioner "must consider" the following in determining a claimant's entitlement to benefits: "(1) objective medical facts and clinical findings; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability; and

(4) claimant's educational background, age, and work experience." *Id*. (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).

### 3. THE TREATING PHYSICIAN RULE

The Commissioner must also accord special evidentiary weight to the opinion of the treating physician. *See Clark,* 143 F.3d at 119. The "treating physician rule," as it is known, "mandates that the medical opinion of the claimant's treating physician [be] given controlling weight if it is well supported by the medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *see Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999); *Clark*, 143 F.3d at 119; *Schisler v. Sullivan*, 3 F.3d 563, 567 (3d Cir. 1993). The rule, as set forth in the regulations, provides:

> Generally, we give more weight to opinions by your treating sources . . . If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

If the opinion of the treating physician as to the nature and severity of the impairment is not given controlling weight, the Commissioner must apply various factors to decide how much weight to give the opinion. *See Shaw*, 221 F.3d at 134; *Clark*, 143 F.3d at 118. These factors include: (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see Clark*, 143 F.3d at 118. When the Commissioner chooses not to give the treating physician's opinion controlling weight, she must "give good reasons in [her] notice of determination or decision for the weight [she] gives [the claimant's] treating source's opinion." *Clark*, 143 F.3d at 118 (quoting C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)).

### B. APPLICATION

Heyliger makes several arguments in opposing defendant's motion for judgment on the pleadings. First, Heyliger argues that the decision of the ALJ was "erroneous, arbitrary and capricious and was not supported by substantiated evidence provided during the critical treatment period in addition to subsequent treatment and current maintenance phases." (Pl.'s Resp. at 2; Compl. ¶ 10.) Second, Heyliger argues that the vocational expert was not instrumental in clarifying the issues of impairments that would affect her ability to satisfactorily perform a given occupation. (Pl.'s Resp. at 2-3; Compl. ¶ 10.) Finally, Heyliger argues that the ALJ failed to accord proper weight to her treating sources and all the medical evidence. (Pl.'s Resp. at 3-4; Compl. ¶ 10.) Because the Court finds that the ALJ failed to provide good reasons for not giving controlling weight to Heyliger's treating physician's opinion, the Court does not address her first and second arguments at this time.

### 1. WEIGHT GIVEN TO TREATING PHYSICIAN'S OPINION

Heyliger's claim is remanded to the Commissioner because the ALJ failed to

15

explain the weight, if any, assigned to the opinion of Heyliger's treating physician, Dr. Reddy, and failed to apply the factors listed in C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) to determine such weight. "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (citing *Shall v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998).

The record indicates that Heyliger was examined by Dr. Reddy every two months from September 4, 1999 until at least March 8, 2001. (*Id*. at 188-93.) On November 21, 2000, Dr. Reddy diagnosed secondary cardiomyopathy, unspecified. (*Id.* at 252.) On November 22, 2000, Dr. Reddy reported that Heyliger had severely reduced cardiac function and global hypokinesis. (*Id*. at 250.) On March 8, 2001, Dr. Reddy indicated that Heyliger had a severely restricted exercise tolerance to less than one block. (*Id*. at 188-93.) Furthermore, Dr. Reddy reported that Heyliger could lift/carry only five pounds occasionally, stand/walk less than two hours per day, and sit up to six hours per day. (*Id*.)

In making her determination, however, the ALJ apparently did not accord Dr. Reddy's opinion controlling weight. Instead, the ALJ considered some of Dr. Reddy's medical opinions, but failed to consider others. For example, the ALJ considered Dr. Reddy's statement on February 5, 2003, that review of the cardiac catheterization "found that the coronary arteries were clean with no evidence of disease," and also included, in a hypothetical, Dr. Reddy's March 8, 2001 opinion that Heyliger could lift/carry only five pounds occasionally, and stand/walk less than two hours per day.[9] (*Id*. at 21, 22.) The ALJ completely failed to consider, however, Dr. Reddy's November 2000 reports that Heyliger had secondary cardiomyopathy, severely reduced cardiac function and global hypokinesis. (*Id*. at 188-93.) Finally, in determining Heyliger's residual functional capacity, the ALJ stated:

> Consideration was given to the opinion of the treating source, but it was not supported by any objective clinical findings. Accordingly, it is found that the claimant retained the residual functional capacity to perform a full range of sedentary work.

(*Id*. at 26.) This conclusory statement does not adequately inform the Court as to whether the five factor analysis was applied. "Where there is a reasonable basis for doubt whether the ALJ applied the correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Schaal*, 134 F.3d at 504 (quoting *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)). Furthermore, the ALJ is not permitted to reject the treating physician's opinion as being unsupported, without first attempting to further develop the record. *See id*. at 505 ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the physician]

---

[9] At oral argument, counsel for defendant argued that whether the ALJ gave Dr. Reddy's opinion controlling weight was not relevant because the ALJ posed Dr. Reddy's findings as a hypothetical to Dr. Siegal. (*See* Tr. at 84, 92.) Dr. Siegal found, based on the ALJ's hypothetical, that Heyliger could still do her past jobs, notwithstanding the fact that she could not lift more than five pounds, and could stand and/or walk only two hours per day, and could sit for up to six hours per day. Obviously, this hypothetical does not match the C.F.R.'s definition of sedentary work, *see supra* footnote 8, defined as work involving lifting no more than *10* pounds at a time, and one which involves a certain amount of walking and standing. Thus, the Court is not convinced that, by presenting Dr. Reddy's findings in a hypothetical to Dr. Siegal, any failure to give the treating physician controlling weight is cured.

*sua sponte*."); *Shaw* 221 F.3d at 131 ("The ALJ has an obligation to develop the record in light of the non-adversarial nature of the benefits proceedings, regardless of whether the claimant is represented by counsesl.").

From the record, it appears the ALJ accepted certain opinions of Dr. Reddy, such as Dr. Reddy's opinion that Heyliger's coronary arteries were clean in 2003, but rejected other opinions of Dr. Reddy, such as his findings in the November 2000 reports. To the extent the ALJ did reject certain of Dr. Reddy's opinions, the ALJ failed to give "good reasons" for this rejection by considering the factors set forth in the C.F.R. *See Baybrook v. Chater*, 940 F. Supp. 668, 674 (D. Vt. 1996) (remanding because the ALJ failed to apply the C.F.R. § 404.1527(d)(2) factors properly); *see Clark*, 143 F.3d at 118. In addition, the ALJ did not attempt to further develop the record, or explain why further development was not necessary. *See Schaal,* 134 F.3d at 504.

For these reasons, the Court finds that the ALJ failed to explain the weight she assigned to the opinion of Heyliger's treating physician, Dr. Reddy, and failed to apply the factors listed in C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) in determining such weight. As such, the Court finds that the ALJ failed to give "good reasons" for the weight given to the treating source's opinion. *See Shaw*, 221 F.3d at 134; *Clark*, 143 F.3d at 118 (holding that when the treating physician's opinion is not given controlling weight, the agency "will always give good reasons in [its] notice of determination or decision for the weight [it] gives [claimant's] treating source's opinion.") (quoting C.F.R. § 404.1527(d)(2)). As the Second Circuit concluded in *Halloran*: "We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004).

In sum, this case must be remanded because the ALJ failed to give "good reasons" for the weight given to plaintiff's treating physician as required by the C.F.R. when a treating physician is not given controlling weight. *See Torregrosa v. Barnhart*, No. CV-03-5275, 2004 U.S. Dist. LEXIS 16988, at *18 (E.D.N.Y. Aug. 27, 2004) (remanding because "(1) there is a reasonable basis to doubt whether the ALJ applied the correct legal standards in weighing the opinions of [the treating physicians], and (2) the ALJ failed to give good reasons for the weight, or lack thereof, given to those opinions ").

III. CONCLUSION

For the reasons set forth above, defendant's motion for judgment on the pleadings is DENIED. The case is REMANDED to the Commissioner for further proceedings consistent with this opinion.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 21, 2006
Central Islip, NY

\* \* \*

Plaintiff appeared in these proceedings *pro se*. Defendant is represented by Special Assistant United States Attorney John M. Kelly, Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, 1 Pierrepont Plaza, 14th Floor, Brooklyn, NY 11201.